UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

                    Plaintiff,                              <u>REPORT & RECOMMENDATION</u>

                                                           11-CR-6181G

             v.

RAUL ABIDEL MARTINEZ,

                    Defendant.

_____


## <u>PRELIMINARY STATEMENT</u>

By Order of Hon. Charles J. Siragusa, United States District Judge, dated October

28, 2011, all pretrial matters in the above-captioned case have been referred to this Court

pursuant to 28 U.S.C. §§ 636(b)(1)(A)-(B).  (Docket # 8).

Defendant Raul Abidel Martinez ("Martinez") has been charged in a two-count

indictment returned on October 27, 2011.  (Docket # 7).  Count One charges him with bank

robbery on August 23, 2011, in violation of 18 U.S.C. § 2113(a).  (*Id.*).  Count Two charges him

with entry into a bank with intent to commit a larceny, also on August 23, 2011, in violation of

the same statute.  (*Id.*).

Currently pending before this Court for report and recommendation are

Martinez's motions to suppress statements he made on August 23, 2011 and identification

testimony to be offered by various witnesses to the alleged robbery.[1]  (Docket # 44).  This Court

_____

[1] Martinez's omnibus motions also sought, *inter alia*, *Jencks* material, evidentiary rulings under Fed. R.
Evid. 404(b), 608 and 609, and preservation of rough notes.  (Docket # 44).  Each of these requests was either
resolved by the parties or decided in open court by the undersigned on October 3, 2013.  (Docket # 49).

conducted an evidentiary hearing on these motions on November 4, 2013.  (Docket # 50).

During the hearing, the government offered testimony from Adams Radens ("Radens"), an

officer with the Rochester Police Department ("RPD"), and David Salvatore ("Salvatore"), a

former investigator for the RPD.  (Tr. 4, 32-33).[2]


## FACTUAL BACKGROUND

### I.   Testimony of Radens

Radens testified he had been employed as an officer with the RPD for

approximately six years.  (Tr. 4).  On August 23, 2011, while assigned to road patrol duty,

Radens responded to a dispatch regarding a bank robbery that had occurred at M & T Bank, 1385

Lyell Avenue, Rochester, New York (the "bank").  (Tr. 4-5).  At the time of the dispatch, Radens

was driving a marked police vehicle and was wearing a police uniform.  (Tr. 5).  Radens did not

drive directly to the bank, but rather began to patrol the vicinity of the robbery in order to search

for the suspect.  (Tr. 5-6).

According to Radens, the following description of the suspect was broadcast over

his radio:  "a light-skinned male Hispanic with brown hair in his mid [twenties], thin build with

gray shirt and pants."  (Tr. 5).  As Radens was driving on Lyell Avenue, a man approached his

police vehicle and asked Radens whether he was responding to the bank robbery.  (Tr. 6).

Radens replied that he was, and the man stated, "the male that you are looking for just went

running eastbound on Lyell Avenue and he went inside 1171 Lyell Avenue."  (*Id.*).

---

[2] The transcript of the November 4, 2013 hearing shall be referred to as "Tr. __."  (Docket # 52).

At that time, Radens began to drive eastbound on Lyell Avenue towards 1171 Lyell Avenue. (*Id.*). As he approached that location, he observed a man walking eastbound on Lyell Avenue who matched the description of the suspect. (Tr. 7). Radens did not have his emergency lights or siren activated. (Tr. 9-10). According to Radens, he pulled his vehicle to the side of the road and got out. (Tr. 9, 22).

Radens loudly called to the man, later identified as Martinez, "Hey, man, can I talk to you?" or words to that effect. (Tr. 11, 18, 24). Martinez stopped, and turned towards Radens, and Radens observed red dye "all over the front of him." (Tr. 11, 25). According to Radens, he immediately conducted a pat frisk of Martinez by holding Martinez's hands behind his back with one hand and patting him down with the other hand. (Tr. 12, 26-27). Radens also lifted Martinez's pant leg to ensure that he did not have a weapon concealed in his sock or shoe and observed red dye covering his leg. (Tr. 30). Radens did not draw his service weapon during his approach or pat frisk of Martinez. (Tr. 12, 16). According to Radens, Martinez was not free to leave. (Tr. 26-27).

As he was conducting the frisk, Radens asked Martinez whether he had any identification on him. (Tr. 12-13). According to Radens, Martinez responded that his identification was in his wallet and stated that he worked for the CIA. (Tr. 12, 28). Radens testified that Martinez continued speaking and made several incriminating statements, although Radens did not ask him any other questions. (Tr. 12-16). Radens located Martinez's identification in the back pocket of his pants. (Tr. 28-29).

Radens handcuffed Martinez and placed him in the rear of his patrol vehicle. (Tr. 13). Upon instructions from his supervisor, Radens transported Martinez to the bank for a

3

show-up identification procedure.  (Tr. 14).  Radens testified that he did not ask Martinez any

questions during the transport and did not participate in the identification procedure at the bank.

(Tr. 14-15).  After the show-up procedure, Radens transported Martinez to the Public Safety

Building.  (Tr. 15-16).  Again, Radens asked Martinez no questions during the drive.  (Tr. 16).

At no time during his encounter with Martinez did Radens read Martinez his

*Miranda* rights.  (Tr. 27-28).


## II.   **Testimony of Salvatore**

Salvatore testified that until approximately eighteen months ago, he had been

employed by the RPD for about twenty-seven years, most recently as an investigator with the

major crimes unit.  (Tr. 33).  Salvatore testified that he had participated in approximately thirty to

forty-five show-up identification procedures during the course of his career, including the one

involving Martinez that occurred on August 23, 2011.  (Tr. 33-34, 46).

Salvatore testified that the robbery of the bank was reported at approximately 2:06

p.m.  (Tr. 54).  He responded to the scene and learned that a suspect had been identified.  (Tr.

33-34).  Salvatore arranged for a show-up identification procedure of the suspect to be

conducted, which took place at 2:35 p.m.  (Tr. 34, 37, 54).

According to Salvatore, he decided to use a window on the south-side of the bank

building as the location from which the witnesses would view Martinez, the suspect.  (Tr. 36).

Martinez was placed outside the window at a distance of approximately ten feet from the

window.  (Tr. 36-39).  He was handcuffed behind his back, and two police officers stood next to

him.  (Tr. 38, 47-48).  Prior to the identification procedure, the pocket of Martinez's pants was

turned out and red dye was visible. (Tr. 38, 48-49). Before beginning the show-up, officers

pushed the pocket inside his pants so that the red dye was not visible. (Tr. 48-49). According

Salvatore, after that adjustment, he could not see any dye on the outside of Martinez's pants from

the viewing vantage point. (Tr. 49). He testified that from the window Martinez was visible

from the top of his head to approximately his thigh area. (Tr. 48-49). Salvatore testified that the

view from the window to Martinez was unobstructed and the weather was clear. (Tr. 36, 39).

   According to Salvatore, four witnesses were placed in a separate area of the bank,

away from the viewing window. (Tr. 34, 37, 40). When he was ready to begin, Salvatore went

to the area where the witnesses were waiting and asked one witness at a time to accompany him

to the viewing area. (Tr. 40). When the witness arrived at the viewing window, Salvatore told

the witness to inform him if he or she recognized the individual, and if so, from where. (Tr. 38).

The witnesses were not given any other instructions or information, and none of the officers

spoke to the witnesses. (Tr. 38-39).

   According to Salvatore, each witness viewed Martinez through the window, while

he observed the procedure. (*Id.*). Once each witness was done, another officer escorted that

witness to a separate area of the bank to be interviewed. (Tr. 40). According to Salvatore, the

witness did not rejoin the remaining witnesses in the waiting area. (*Id.*).

   Salvatore repeated this process for each of the four witnesses. (*Id.*). According to

Salvatore, two of the witnesses identified Martinez as the robber, one did not, and one stated, "I

think that's him." (Tr. 40-41).

**DISCUSSION**

I.    **Motion to Suppress Statements**

Statements made during custodial interrogation are generally inadmissible unless a suspect first has been advised of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966).  In *Miranda*, the Supreme Court held that the prosecution may not use a defendant's statements that are the product of custodial interrogation unless it demonstrates that the defendant was first warned of his Fifth Amendment privilege against self-incrimination and then voluntarily waived that right.  *Miranda v. Arizona*, 384 U.S. at 444.  As the Second Circuit has stated:

> [I]nterrogation consists of express questioning or its functional
> equivalent. . . .  [T]he overarching "custody" question is whether a
> reasonable person in the suspect's position would have understood
> [himself] to be subjected to restraints comparable to those
> associated with a formal arrest.

*United States v. FNU LNU*, 653 F.3d 144, 148, 153 (2d Cir. 2011) (internal quotations and brackets omitted).

Interrogation includes direct questioning, as well as "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."  *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980); *see also United States v. Montana*, 958 F.2d 516, 518 (2d Cir. 1992).  Under the "pedigree exception" to the *Miranda* requirement, the "solicitation of information concerning a person's identity and background does not amount to custodial interrogation prohibited by *Miranda v. Arizona*, . . . whether that solicitation occurs before . . . or after . . . *Miranda* warnings are given."  *United States v. Adegbite*, 846 F.2d 834, 838 (2d Cir.

6

1988) (citations omitted).  The pedigree exception includes "routine booking question[s]"
designed to elicit "biographical data necessary to complete booking or pretrial services."
*Pennsylvania v. Muniz*, 496 U.S. 582, 601-02 (1990).

The pedigree exception does not include questions designed to elicit incriminating
admissions.  *Id.* at 602 n.14; *see also Rhode Island v. Innis*, 446 U.S. at 301.  As the Second
Circuit has acknowledged, "[r]outine questions about a suspect's identity . . . [are] ordinarily
innocent of any investigative purpose [and] do not pose the dangers *Miranda* was designed to
check; they are rather the sort of questions 'normally attendant to arrest and custody.'"  *United
States v. Gotchis*, 803 F.2d 74, 79 (2d Cir. 1986) (quoting *Innis*, 446 U.S. 291, 301 (1980)).

In this case, Radens lawfully inquired of Martinez whether he had any
identification.  *See, e.g.*, *United States v. Carmona*, 873 F.2d 569, 573 (2d Cir. 1989) ("[p]olice
often know the names of suspects they intend to apprehend, . . . [but] [a]s a cautionary measure,
police usually prudently inquire as to the suspect's name to ensure that the wrong person is not
apprehended"); *United States v. Adegbite*, 846 F.2d at 838 (pedigree exception allows solicitation
of a defendant's nickname, which was used on arrest warrant, for identification purposes); *United
States v. White*, 2007 WL 772387, *7 (W.D.N.Y. 2007) ("the only questions put to [d]efendant
prior to advising of the *Miranda* warning were questions aimed at determining [d]efendant's
identity[;] [i]t is well established that 'questions aimed at eliciting identifying or 'pedigree'
information is permitted without [*Miranda*] warnings, even though the answers to such questions
may become evidence either of the particular crime for which the suspect was arrested, or of
some past or future crime not yet under investigation'") (quoting *Nicholas v. Goord*, 430 F.3d
652, 680 (2d Cir. 2005) (Lynch, J. concurring), *cert. denied*, 549 U.S. 953 (2006)); *United States*

7

*v. Kadem*, 317 F. Supp. 2d 239, 241 (W.D.N.Y. 2004) (pedigree exception permits request that defendant identify himself in order to ensure correct person is apprehended); *United States v. Tavares*, 2002 WL 31571662, *6 (S.D.N.Y. 2002) (questions as to the defendant's age, name, address and identification fell within pedigree exception where the "questioning was of a limited nature, designed to establish [defendant's] true age and identity").  That Martinez responded by making various spontaneous statements that were unconnected in subject matter to the issue of identification does not transform Radens's permissible inquiry into interrogation within the meaning of the Fifth Amendment.  *See*, *e.g.*, *United States v. Castro*, 723 F.2d 1527, 1532 (11th Cir. 1984) (finding defendant's statement "spontaneously volunteered" where it was made in response to police questions, but was wholly unresponsive to question posed by officer); *United States v. Thomas*, 961 F. Supp. 43, 45-46 (W.D.N.Y. 1997) (defendant's second statement was unsolicited, spontaneous and voluntary where initial statement was made in response to police question and subsequent statement was non-responsive to officer's question; "single inquiry about the genesis of the altercation was, under all the circumstances, not calculated to induce an admission as to [defendant's] intent"); *see also Rosa v. McCray*, 396 F.3d 210, 222 (2d Cir.) (defendant's statement concerning when he had dyed his hair was offered "voluntarily and outside the scope of the question" about defendant's natural hair color), *cert. denied*, 546 U.S. 889 (2005); *United States v. Tavares*, 2002 WL 31571662 at *6 ("[s]imply because a defendant gives false information in response to pedigree questions, and therefore renders the information incriminating, does not mean that *Miranda* warnings were required").  Accordingly, I recommend that the district court deny Martinez's motion to suppress statements.

II.   **Motion to Suppress Identification Testimony**

As the Supreme Court has consistently affirmed, a defendant has the right not to be subjected to an identification procedure that creates a "very substantial likelihood of irreparable misidentification." *Manson v. Brathwaite*, 432 U.S. 98, 116 (1977) (quoting *Simmons v. United States*, 390 U.S. 377, 384 (1968)); *see also Stovall v. Denno*, 388 U.S. 293, 301-02 (1967). Moreover, due process requires the suppression of any pretrial identification procedure that is unduly suggestive and not otherwise independently reliable. *Manson v. Brathwaite*, 432 U.S. at 114 ("reliability is the linchpin in determining the admissibility of identification testimony").

In determining the admissibility of a pretrial identification, the court must undertake a two-step analysis. First, the court must consider whether the identification procedure was unnecessarily suggestive. If so, the court then must determine whether the identification nevertheless possessed "sufficient aspects of reliability." *United States v. Bubar*, 567 F.2d 192, 197 (2d Cir.), *cert. denied*, 434 U.S. 872 (1977).

Although show-up procedures have been "widely condemned" as inherently suggestive because they involve "the presentation of a single suspect to a witness by the police," such identification procedures only violate due process if they are "*unnecessarily* suggestive." *Brisco v. Ercole*, 565 F.3d 80, 88 (2d Cir.), *cert. denied*, 558 U.S. 1063 (2009) (quotation omitted). As the Second Circuit has recognized, "[e]xigent circumstances generally weigh in favor of concluding that a showup identification procedure was not unnecessarily suggestive, because a showup procedure may be necessary . . . to quickly confirm the identity of a suspect, or to ensure the release of an innocent suspect." *Id.* Acknowledging the importance of these law

9

enforcement objectives, courts frequently have upheld on-the-scene show-ups conducted in temporal and geographic proximity to the alleged criminal conduct, reasoning that such procedures are not *unnecessarily* suggestive. *See, e.g., id.* ("we have instructed that where an officer has or should have doubts whether a detained suspect is in fact the person sought, the officer must make immediate reasonable efforts to confirm the suspect's identity") (internal quotations omitted); *United States v. Bautista*, 23 F.3d 726, 729-30 (2d Cir.) (presentation of suspects to confidential informant immediately after raid was not unnecessarily suggestive), *cert. denied*, 513 U.S. 862 (1994); *United States v. Sanchez*, 422 F.2d 1198, 1200 (2d Cir. 1970) ("prompt on-the-scene confrontation . . . was consistent with good police work . . . [in order] to insure the immediate release of an innocent suspect and at the same time [to] enable the police to resume the search for the fleeing culprit while the trail is fresh") (internal quotation omitted); *Berry v. Cunningham*, 2012 WL 4174875, *5 (E.D.N.Y. 2012) ("[t]he identification took place about an hour after the commission of the crime and only five minutes after the arrest[;] [t]he arresting officers were justified in seeking confirmation of whether they had arrested a likely suspect, in order to avoid arresting an innocent person); *Charlemagne v. Goord*, 2008 WL 2971768, *14 (S.D.N.Y. 2008) ("prompt identification of [suspects] was necessary to ensure that the officers had found the correct individuals before the trail had grown cold[;] . . . it was essential for law enforcement to take the most expeditious steps possible to ensure that the persons in custody were, in fact, the persons sought"), *report and recommendation adopted*, 2011 WL 2150646 (S.D.N.Y. 2011); *Lockhart v. Brown*, 2008 WL 2397609, *5 (N.D.N.Y. 2008) ("[t]he Second Circuit has recognized that show-up procedures are a valid and necessary way to ensure that police have detained the actual perpetrators of the crime at issue and that innocent

people are released, and have consistently upheld the validity of show-ups when they are

conducted in close temporal and geographic proximity to the crime scene"), *aff'd*, 354 F. App'x

457 (2d Cir. 2009); *Mendoza v. McGinnis*, 2004 WL 736894, *6 (S.D.N.Y. 2004) ("show-up

identifications that occur in temporal and geographic proximity to the crime have generally been

found constitutionally permissible and not unduly suggestive") (collecting cases).

        In this case, the police conducted the show-up procedure at the bank within half

an hour after the reported robbery and promptly upon the apprehension of Martinez.  *See United

States ex rel. Springle v. Follette*, 435 F.2d 1380, 1383 (2d Cir. 1970) ("[t]h[e] fact of immediacy

makes it much more likely that the witness will have a fresh recollection of the appearance of the

suspect and hence that the identification will be accurate"), *cert. denied*, 401 U.S. 980 (1971);

*see also Brisco v. Ercole*, 565 F.3d at 89 ("we have held that identification evidence from

showups held in close temporal and geographic proximity to the crime scene may be admitted");

*Charlemagne v. Goord*, 2008 WL 2971768 at *15 ("the fact that the show-up occurred within

thirty minutes of the burglary and only eighteen blocks from the scene of the crime . . . further

suggests that the procedure was not unduly suggestive and was, instead, the product of effective

police work"); *Jones v. West*, 473 F. Supp. 2d 390, 417 (W.D.N.Y. 2007) ("the show-up was

conducted within an hour after the robbery at the crime scene, factors that favor a finding that the

police used a show-up out of reasonable necessity"), *rev'd on other grounds*, 555 F.3d 90 (2d

Cir. 2009).  Moreover, the police employed various safeguards to diminish the suggestiveness,

including providing non-suggestive instructions, ensuring that the dye was not visible on

Martinez's clothing from the viewing window, displaying the suspect to the witnesses one at a

time and ensuring that the witnesses did not observe or overhear the other witnesses' reactions to

the show-up.  *See Jones v. West*, 473 F. Supp. 2d at 417-18 (concluding identification not

unnecessarily suggestive where the officers kept the witnesses separated, instructed the witnesses

separately, conducted separate procedures for each witness, did not permit the other witnesses to

observe the procedures and did not permit the witnesses to discuss the identification procedures

after they concluded).  That the suspect was in handcuffs (even if they could be seen by the

witnesses in this case, which is unclear from the record) does not automatically render the

procedure unduly suggestive.  *See United States v. Bautista*, 23 F.3d at 730 ("[i]n this case,

handcuffs, custody and flashlights were all necessary incidents of an on-the-scene identification

immediately following a night-time narcotics raid"); *Berry v. Cunningham*, 2012 WL 4174875 at

*5 ("[a]lthough the one-on-one show-up – with a hand-cuffed suspect, standing next to police

officers and the getaway vehicle – was suggestive, it was justified by exigent circumstances");

*Jones*, 473 F. Supp. 2d at 418 (procedure not unduly suggestive even though suspect "was

handcuffed and was accompanied by at least one police officer"); *United States v. Ortiz*, 2000

WL 37998, *1 (S.D.N.Y. 2000) (show-up identification procedure not unduly suggestive where

defendants were "in handcuffs, standing beside a marked police car, and accompanied by

uniformed police officers").

            Considering all the circumstances, and the need to confirm or dispel Radens's

suspicion that Martinez was the perpetrator, I find that the show-up procedure, while suggestive,

was not unduly so.  *See Bautista*, 23 F.3d at 730 ("presentation of the suspects to the CI for the

purpose of identifying perpetrators and releasing innocent persons was necessary"); *United States*

*ex rel. Cummings v. Zelker*, 455 F.2d 714, 716 (2d Cir.) (show-up procedure permissible to

ensure "the immediate release of an innocent suspect and at the same time to enable the police to

resume the search for the fleeing culprit while the trail [was] fresh"), *cert. denied*, 406 U.S. 927

(1972) (quotation omitted); *Berry*, 2012 WL 4174875 at *5 (show-up procedure was necessary

and not unduly suggestive where it was conducted upon apprehension of suspect within

approximately one hour after the robbery); *Casillas v. Murray*, 662 F. Supp. 2d 300, 313-14

(W.D.N.Y. 2009) (show-up procedure not unnecessarily suggestive where it was conducted at the

scene of the crime within twenty minutes of the attempted robbery); *Charlemagne*, 2008 WL

2971768 at *14-15 (show-up procedure not unduly suggestive where procedure was conducted

promptly upon apprehension of suspect approximately thirty minutes after the burglary and

approximately eighteen blocks from the scene of the crime); *Jones*, 473 F. Supp. 2d at 417-18

(show-up procedure not unduly suggestive even though suspect was handcuffed and

accompanied by at least one police officer where it was conducted at the crime scene within one

hour of the robbery and where the officers separated the witnesses and conducted separate

identification procedures); *United States v. Ortiz*, 2000 WL 37998 at *1 (evidence of

identification not suppressed where defendants, in handcuffs and accompanied by police officers,

were identified by robbery victims near the location of the robbery shortly after defendants'

arrest).  Accordingly, I recommend that the district court deny Martinez's motion to suppress

identification testimony from the witnesses who participated in the show-up procedure.

## <u>CONCLUSION</u>

For the reasons stated above, I recommend that the district court deny Martinez's

motions to suppress statements and identification testimony.  (Docket # 44).


<u>s/Marian W. Payson</u>
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
      April <u>29</u>, 2014

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York.[3]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See, e.g.*, *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 59(b) may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**

*s/Marian W. Payson*

MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
      April   29  , 2014

---

[3]  Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(D) commences with the filing of this Report and Recommendation.  Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the fourteen days allowed for filing objections has elapsed. *United States v. Andress*, 943 F.2d 622 (6th Cir. 1991); *United States v. Long*, 900 F.2d 1270 (8th Cir. 1990).